**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION**

LESLEY McKINNEY,              ]
                                ]
        Plaintiff,          ]
                                ]
v.                            ]     Case No. 2:24-CV-
                                ]
JOHN K. SLAUGHTER, and wife  ]
SHAUNA SLAUGHTER, individually ]
and d/b/a ROGERSVILLE ANIMAL ]
HOSPITAL, and the ROGERSVILLE ]
ANIMAL HOSPITAL,         ]
                                ]
        Defendants.      ]

Plaintiff files her claims for race discrimination and retaliation in employment and for a continuing racially hostile work environment which culminated in her discharge and avers:

1.  The plaintiff's federal employment discrimination/retaliation claims are properly before this Court pursuant to its federal question jurisdiction conferred by *28 U.S.C. §1331*.  The plaintiff's federal racially hostile work environment and retaliatory/discriminatory discharge claims are premised upon the provisions at *42 U.S.C. §1981*.

2.  Plaintiff McKinney is a black female, 55-years of age.  She is a resident of Hawkins County, Tennessee.  At the times pertinent to her federal race

discrimination during employment claims, the plaintiff was employed by defendants John K. Slaughter, his wife Shauna Slaughter, and their business entity Rogersville Animal Hospital. During her tenure of employment, the plaintiff was the defendants' the only black employee.

3. Defendant John K. Slaughter is a resident of Hawkins County, Tennessee. He is a licensed veterinarian. John Slaughter and his wife defendant Shauna Slaughter own, operate, and control their business entity Rogersville Animal Hospital, which is located at 650 West Broadway, Rogersville, Tennessee 37857, as sole proprietor/partners. Both defendants Slaughter were, and are the managing agents and alter egos of their business operation. Each defendant is individually personally liable for their and their co-defendants' employment discrimination and retaliation described hereinafter. John Slaughter and Shauna Slaughter each had the authority to, and did, sign employees' payroll checks and direct their employees' employment-related activities. The individual defendants Slaugher and their business entity veterinarian hospital have each been served with process by certified return receipt requested mail at their respective business address.

4. Prior to her employment with the defendants, plaintiff McKinney was acquainted with both John Slaughter and wife Shauna Slaughter on a friendly basis. The defendants originally hired plaintiff McKinney, according to defendant

2

Shauna Slaughter, to "help" with the animals, work at the hospital's front desk, answer telephones, and cleaning some in the back and front areas of the building, and working every Saturday until the defendant hired more help. After she began working, the plaintiff was told by the defendants' other white female co-workers that they had been told by Shauna Slaughter the plaintiff would "only be doing the cleaning."

5.     Early during her employment, the plaintiff noticed that the Slaughters' attitudes and comments toward her became less courteous and more hostile. On or about April 4, 2022, while she and John Slaugher were in the main animal area, the plaintiff asked defendant Slaughter how she was doing. Slaughter replied: "out of sight and out of mind - that is the way I like it."

6. On or about April 5, 2022, the defendant Shauna Slaughter advised the plaintiff they needed her to work at the office because they were short-handed. In late April, the plaintiff asked defendant John Slaughter during lunch if she could keep the front desk job. The defendant replied that he would "try it and see."

7.   On or about May 4, 2022, a white employee with first name of Katelyn struck the plaintiff across the chest with a dog leash while she was at the front desk and laughed. Katelyn also pushed her rolling chair against the plaintiff while the plaintiff was working at the front desk. The plaintiff complained to the defendant's veterinarian Amanda Saunders who responded that she "would talk to

3

John" and that John would talk to her. Defendant John Slaughter never acknowledged the plaintiff's harassment complaint. Katelyn left the defendant's employee shortly thereafter.

8. On June 14, 2023, white employee Martha Schipp commented to the plaintiff in front of veterinarian Saunders that she [Schipp] liked the plaintiff because she was "black and a good worker." When Saunders replied that the comment was because the plaintiff's race had nothing to do with her being a good worker, Schipp answered: "whatever."

9. On June 27, 2022, white co-worker Toni Morris screamed at the plaintiff and used profane language to criticize her for taking a late walk-in client who had talked earlier with owner Slaughter. When the plaintiff complained about the verbal abuse to defendant Shauna Slaughter, Slaughter told her not to worry about it.

10. In early July 2022, the defendants hired another white employee Devon Morgan to help with the front desk-reception area work. When the plaintiff asked if she could stop working every Saturday since two employees could now cover the front desk, Shauna Slaugher insisted that the plaintiff and not the new white employee had to continue to work every Saturday

11. On August 4, 2022, white co-workers Christy Bates, Devon Morgan, and Martha Schipp accused the plaintiff of shorting the clinic's cash

drawer by not charging for dog food. When the plaintiff protested that she had charged for everything she sold, Schipp told the plaintiff to watch what she was doing, laughed and walked away. Bates and Morgan commented: "and they have you training us when you can't even do your job correctly."

12. The next month, the plaintiff discovered that a white employee had overcharged a customer. **[I can't tell enough about the $10.00 to use it here.]**

13. On August 22, the plaintiff complained to defendant Shauna Slaughter that white co-workers Morgan and Bates were fabricating performance accusations against her, claiming that the plaintiff didn't know anything, and insisting that they didn't have to listen to her. The plaintiff also advised Slaughter that the two white females would interfere with her computer operations and prevent her from doing her job at the front desk. Slaughter replied with discriminatory nonchalance that the plaintiff would just have to "deal with it" herself.

14. On September 11, 2022, the simmering and continuing racially hostile work environment escalated into a meeting during which defendant Shauna Slaughter told the plaintiff that all of the white employees had complained that the plaintiff was "bossy" and self-centered, had a negative attitude, had no respect for others, and created a stressful environment. Slaughter stated that all the white co-workers did not want to work with the plaintiff. The plaintiff responded that the

accusations were not true.

15. Slaughter told the plaintiff that she needed to write an essay on what it took to be a good manager even though, as plaintiff McKinney pointed out, she was not a manager. Slaughter responded that the plaintiff needed to act "in a proper manner" and to "be quiet and let it all sink in." Slaughter handed the plaintiff some papers and handwritten notes and told her that she was only good at keeping the office "smelling good and clean."

16. Shauna Slaughter further racially insulted and demeaned the plaintiff by telling her she was placing extra surveillance cameras on the plaintiff at the front desk despite that the fact that the defendants' veterinary clinic already had security cameras installed for the front desk-reception area. Plaintiff McKinney asked Slaughter to check the existing camera footage to confirm that she was not doing anything wrong.

17. On or about September 16, 2022, the plaintiff was attempting to correct a ten-cents credit card sales entry when white co-worker Devon Morgan accosted her and discriminatorily accused her of "covering her butt." In fact, Moran's initials were on the incorrect credit card entry, Morgan exploded angrily at the plaintiff and insisted that the plaintiff "was the problem," that she did not like the plaintiff, and that she would not work with the plaintiff again.

18. On or about October 17, 2022, the plaintiff was busy dealing with

6

more than a dozen clients entering the reception are.  As white employees Schipp and Scanlan walked through the reception area toward the front door, Schipp publicly demeaned the plaintiff by yelling at her in front of the clients that there was "s–t on the floor and she needed to get it up.  Schipp and Scanlan laughed as they walked outside, leaving the plaintiff with a reception room full of clients.  Schipp and Scanlan were not the plaintiff's supervisors.

19.   On or about November 3, 2022, the plaintiff was filing a prescription for a client when white co-worker Teya Wakins told her to clean up "dog pee."  When the plaintiff asked why the white co-worker who was handling the dog hadn't cleaned it up, Watkins replied that it was "the plaintiff's job to do that."

20.   On or about December 7, 2022, white co-worker Toni Morris used rude profanity in response to the plaintiff's inquiry regarding animal medications with which the plaintiff was unfamiliar.  Morris embarrassed and insulted  the plaintiff by telling her that she couldn't do her job.

21.   During this same span of time, the plaintiff became the butt of her white co-workers racially-based jealous remarks and animosity.  The plaintiff's husband had retired from Eastman as a trainer and chemical operator.  The plaintiff drove a Lexus automobile.  The white co-workers repeatedly commented cattily on the plaintiff's driving a Lexus but did not comment on the vehicles which each of

7

them drove. When the plaintiff wore a new pair of tennis shoes to work, her white co-workers repeatedly commented on them but did not comment on the footware which each of them wore to work. The plaintiff's and her husband's erecting an open-air pavilion in their back yard also became the subject of continuous office gossip and snide remarks by white co-workers. The plaintiff's white co-workers frequently made racist-tinged remarks to the plaintiff about her hair being long and straight and insisted that black people didn't have long straight hair. When clients brought food items to the clinic as gifts for the employees, the white employees appropriated the food without offering any to the plaintiff

22. Despite the almost daily insulting and derogatory comments and conduct by her white co-workers, the plaintiff continued to do her job as best she could. She needed her job, lived close to the veterinary clinic, and realized that her complaining to the Slaughters had become futile. The plaintiff did not confront or respond emotionally to any of the white employees regarding their continuing derogatory insults. To the contrary she gave each employee a Christmas gift in December 2022 and brought decorations from her home to decorate the clinic's front lobby.

23. On or about January 3, 2023, white co-worker Misty Kochensparger approached the plaintiff at the front desk and falsely accused her of giving a client's pet to the wrong person. As a result of Kochensparger's

malicious lie, the client's son telephoned the plaintiff and began cussing her. The plaintiff had to reassure the client and his son that their pet was still at the hospital and retrieved the pet for the owner. While this deliberately instigated confusion was occurring, Kockensparger tried to hide the client's expensive pet carrier so she could steal it when the office closed. The plaintiff refused Kocknsparger's demand that she hide the carrier for her.

24. On or about January 11, 2023, Misty Kockensparger demanded to know why the plaintiff intended to leave work early. When the plaintiff responded that she had a doctor's appointment, Kockensparger asked what was wrong with the plaintiff. Instead of telling Kockensparger that was none of her business as she was legally entitled to have done, the plaintiff replied: "Depression." Kockensparger immediately retorted: "How do you not kill yourself?" Taken aback by the insult, the plaintiff replied "shame on you," and walked away.

25. On or about January 30, 2023, the plaintiff and Teya Watkins were working the front desk when a client asked if the plaintiff knew anyone who could take any of three puppies he needed to find homes for because of his failing health condition. White co-worker Devaon Morgan came by and the plaintiff asked her about taking any of the puppies. Morgan replied angrily: "Nope, No, and don't ask me again," in front of the client. The client's wife appeared immediately offended by the tone and substance of Morgan's statement.

9

26. The plaintiff located Morgan in the back room and asked her not to talk to her like her because it was embarrassing and disrespectful. Morgan immediately responded with rude profanity and accused the plaintiff of telling her what to do. The plaintiff replied that she was just asking not to be talked to "like that" and returned to the front desk.

27. The next day January 31, defendant John Slaughter called the plaintiff into his office and angrily berated her for attempting to start a fight with Morgan the day before. When the plaintiff told Slaughter that Morgan had been rude to her in front of clients, Slaughter responded that she was "lying" and should "shut up." Slaughter falsely accused the plaintiff of attempting to hit Morgan. When the plaintiff tried to explain herself, Slaughter insisted again that she was a "liar" and "the damn problem."

28. Frank Slaughter continued his racially hostile tirade with the threat that he didn't want to fire the plaintiff but if she said anything else to anyone that he would fire her. Slaughter's repeatedly crediting complaints by white racist co-workers against the plaintiff, favoring them in employment actions, and repeatedly insulting the plaintiff when she complained about or attempted to explain the specifics of a harassment episode is evidence of Slaughter's racial bias against the plaintiff

29. On or about February 9, 2023, Kockensparger overheard the

plaintiff discussing a job position with a Pet Cremation Services of East Tennessee representative who had brought in her dog for treatment. Kockensparger demanded that the plaintiff tell her about the other job because she needed that job more than the plaintiff did. Plaintiff McKinney replied that Kockensparger could call the representative herself.

30. On or about February 10, 2023, white co-worker Toni Morris came to the front desk and criticized the plaintiff with profane and insulting language in front of clients for noting her early intention to leave work early that day on the schedule.

31. None of the white female co-workers who made the above described racially motivated insulting comments about the plaintiff, her job duties, or her job performance were the plaintiff's supervisors. Despite the plaintiff's having complained about or having attempted to complain about the continuing hostile insulting comments to owner John Slaughter and his wife Shauna Slaughter, the defendants continued to allow their white employees to harass, demean, insult, and humiliate the plaintiff in front of clients and other employees.

32. On or about February 16, 2023, the plaintiff was bitten by a client's dog. Defendant John Slaugher refused to look at the plaintiff's wound and remarked it wouldn't be the last time that happened working there and walked away.

33. On or about March 1, 2023, white co-worker Morgan slammed a swinging door into the plaintiff's out-stretched hand, smiled at the plaintiff, and walked away. Later in the day, the plaintiff complained to Shauna Slaughter about Morgan's harassment, the door slamming episode, Morgan's frequently blocking her efforts to walk down the office's hallway, and Morgan's periodically standing and staring at her from the medical counter in the front office.

34. Slaughter again discriminatorily rebuffed the plaintiff and told her just to do her job and "shut up." Slaughter told the plaintiff that they had a new veterinarian coming and she needed to behave herself. When the plaintiff replied that she would talk with John Slaughter, Shauna Slaughter responded that "it won't matter." The plaintiff then complained directly to defendant John Slaughter about Morgan's harassment and her injured hand. Slaughter made no meaningful response. The hostile work environment continued.

35. On March 3, 2023, co-worker Martha Schipp told the plaintiff that John Slaughter had never seen the plaintiff attempt to hit Morgan as Slaughter had claimed earlier.

36. During lunch that day white co-worker Kockensparger told the plaintiff that: "they are going to bring back hanging from a tree for punishment and pull people behind a car." The plaintiff was aware that black individuals had in the past been lynched from trees and dragged to their deaths behind vehicles and was

12

personally offended. She replied "that was a racist remark." Kockensparger stated: "it would make things easier for some of us."

37. On March 28, the plaintiff looked for paper for the credit card machine in defendant Slaughter's office. Kockensparger's walked in and berated the plaintiff with profanity while repeatedly yelling that the plaintiff she needed to "f-----g grow up" and "quit talking garbage." Other white co-workers who heard Kockensparger loudly insult the plaintiff walked away.

38. The intensely hostile work environment described above aggravated and increased the plaintiff's pre-existing depression. She sought additional medical treatment.

39. At the end of the work day on March 29, 2023, the plaintiff handed defendant John Slaughter her physician's note regarding her being restricted to working four hours per day because of her medical condition. Slaughter first stated that he wasn't sure he could do that. However, Slaughter permitted white employees to work with accommodation restrictions.

40. Slaughter asked the plaintiff what was so stressful about working for him. The plaintiff reminded Slaughter about everything she had told him earlier and then about Kockensparger's "you need to f-----g grow up" rant the day before. Slaughter immediately accused the plaintiff of being a liar. The plaintiff told Slaughter to check with Martha Schipp to confirm her description of

13

Kockensparger's harassment.

41. The plaintiff reminded defendant Slaughter that she had discussed her depression with him previously. When Slaughter again insisted that she had been ready to hit Morgan earlier in the year, the plaintiff told him to pull the camera footage which would confirm she had not. Slaughter again called the plaintiff "a liar." When the plaintiff protested her innocence, Slaughter stated that he would "fix this problem" and that the plaintiff was "fired, fired, fired." The plaintiff hugged Martha Schipp, clocked out, and left the defendant's premises.

42. The above described significant episodes of the defendant's continuing race-based hostile work environment were objectively and subjectively intimidating, malicious, and insulting and impaired and damaged the plaintiff's employment situation and her personal mental health. The continuing connected episodes of harassment created an abusive working environment. When the plaintiff engaged in the protected activity of complaining to John Slaughter and his wife Shauna Slaughter about the white-coworkers' continuing harassment, both Slaughters turned a deaf ear, called the plaintiff a liar, and told her to deal with the harassment herself.

43. The plaintiff's complaints of harassment by her white co-workers were protected activities. In ignoring the plaintiff's complaints and in insulting her and penalizing her for complaining, the defendants condoned, participated in, and

intensified the existing hostile work environment.

44. The plaintiff was, and is, a member of a protected class because of her race, was performing her veterinarian clinic jobs satisfactorily, was subjected to an increasingly race-based hostile work environment by her white co-workers and by both John Slaughter and Shauna Slaugher. The hostile work environment interfered with her employment and impaired her health and ability to work full time. The Slaughters insulted and demeaned the plaintiff whenever she complained about the white co-workers' continuing harassment because she was the only black employee. Defendant John Slaughter refused to accommodate the plaintiff' medical work restrictions when the plaintiff presented them to him, even though he had accommodated work restrictions for white employees, called the plaintiff "a liar" when she attempted to explain again why the co-worker harassment had aggravated her depression, accused the plaintiff of being "the problem," and discharged her. The hostile work environment culminated in the plaintiff's illegal discharge. The defendants discriminated and retaliated against the plaintiff when they discharged her.

45. Federal courts apply the same analytical and evidentiary standards to race discrimination and hostile work environment claims brought under *42 U.S.C. §1981* or under the Tennessee Human Rights Act as they do for Title VII race discrimination in employment claims. *Pendleton v. Bob Frensley Chrysler Jee*

*Dodge Ram, Inc., No. 3:14, 2016 WL 2927983, at \*3 (M.D. Tenn. May 19, 2016);
Barrett v. Whirlpool Corp, 556 F.3d 502, 511 (6th Cir. 2009); Amini v. Oberline
College, 440 F.3d 350, 358 (6th Cir. 2006);* and *University of Texas Sw. Med.
Center v. Nassar, 570 U.S. 338 (2013).*

  46.  The defendants' maintenance, condonation of, and participation
in the  the continuing race-based hostile work environment, their refusing to stop
the harassment, and their illegally discharging the plaintiff were deliberate, willful,
in bad faith, and in reckless disregard of the plaintiff's federally protected rights.
The defendant's race-based hostile work environment and discrimination and
retaliation damaged the plaintiff emotionally and mentally, caused her to sustain
lost wages, impaired her earning capacity, and diminished her enjoyment of life.
The plaintiff is entitled to awards of compensatory damages and punitive damages
from the defendants.

  47.  Because the defendants employed less than 15 individuals, the
plaintiff could not file administrative charges with the EEOC.  However, she is not
required to exhaust any parallel remedies in order to bring her *42 U.S.C. §1981*
race discrimination/retaliation and hostile work environment claims against the
defendants Slaughter and their business entity.

WHEREFORE, THE PLAINTIFF DEMANDS:

1.  Judgment against each defendant, jointly and severally, for all compensatory damages allowed by federal law.

2.  Judgement against each defendant, jointly and severally, for all punitive damages allowed by federal law.

3.  A jury to try her claims.

4.  Such other relief to which she may be entitled.

5.  An award of attorneys fees as the prevailing party under federal law.

Respectfully Submitted,

s/ C. R. DeVault, Jr.
CHARLTON R. DEVAULT, JR.
TN BPR #000428
102 Broad Street
Kingsport, TN 37660
(423) 246-3601

ATTORNEY FOR THE PLAINTIFF